## STEWART v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1914.)

No. 2320.

1. CRIMINAL LAW (§ 759*)—INSTRUCTIONS—FLIGHT.

In a prosecution for homicide, the court charged that defendant's defense was that he did not kill deceased and did not participate in the commission of the crime by any act of his own, or agreement, plan, or understanding with codefendant, but admitted that he participated in a robbery of the bodies of the persons killed; that the statute provided that killing of a human being committed in the perpetration of or attempt to perpetrate a robbery was murder; and that defendant's flight with his codefendant was evidence of guilt and a fact for the jury's consideration. *Held*, that such instruction, in so far as it referred to flight, was not fatally defective as instructing the jury, as a matter of law, that defendant was guilty of the offense charged if he fled from the scene of the crime.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1737, 1738, 1790–1793; Dec. Dig. § 759.*]

2. CRIMINAL LAW (§ 444*)—EVIDENCE—MAPS.

Where a map, offered in evidence, showed on its face that it was issued from the General Land Office under the authority of the Secretary of the Interior, it was admissible, without independent proof of its accuracy or authenticity, to show the location of an Indian Reservation on which it was claimed the homicide in question occurred.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1028; Dec. Dig. § 444.*]

3. CRIMINAL LAW (§ 1169*)—APPEAL—RULINGS ON EVIDENCE—PREJUDICE.

Where, in a prosecution for homicide alleged to have been committed on the White Mountain Indian reservation, several witnesses were called by the government, all of whom resided in Arizona and for many years had been familiar with the boundaries of the reservation and the location of the scene of the homicide, and all testified that the latter was within the boundaries of the reservation, defendant was not prejudiced by any error in the admission of a map of the territory showing the reservation boundaries without sufficient proof of its accuracy or authenticity.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 754, 3088, 3130, 3137–3143; Dec. Dig. § 1169.*]

4. CRIMINAL LAW (§ 346*)—PLACE OF OFFENSE—INDIAN RESERVATION—BOUNDARIES—EVIDENCE.

Where the government claimed that a homicide was committed on an Indian reservation, evidence of persons who had resided in Arizona for many years and were familiar with the boundaries of the reservations in that state and the location of the scene of the homicide was admissible to show that such scene was within the reservation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 786; Dec. Dig. § 346.*]

5. CRIMINAL LAW (§ 631*)—TRIAL—COPY OF LIST—STATUTES—APPLICATION.

Rev. St. § 1033, provides that, when a defendant is indicted for a capital offense, a copy of the indictment and list of jurors and witnesses shall be

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

delivered to him at least two days before trial. *Held*, that such provision applies only to the list of the regular panel of jurors in attendance at the opening of the trial and does not require notice of jurors brought in on a special venire to complete the jury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1379, 1437–1446; Dec. Dig. § 631.*]

6. CRIMINAL LAW (§ 472*)—EVIDENCE—OPINION—PERSONS—RACE.
In a prosecution for homicide committed on an Indian reservation, evidence of a witness who had had intimate knowledge of Indian characteristics, gained from many years' official connection with Indian reservations, that in his opinion defendant was a white man and not an Indian was competent.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1059; Dec. Dig. § 472.*]

7. CRIMINAL LAW (§ 718*)—TRIAL—UNITED STATES ATTORNEY—MISCONDUCT.
In a prosecution for homicide, the district attorney, in closing his argument, said, "We will ask you to reach a verdict of guilty, and to affix the death penalty on this young man, as has been done on his partner in crime." *Held*, that such statement with reference to accused's codefendant was improper.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1668; Dec. Dig. § 718.*]

8. CRIMINAL LAW (§ 1171*) — APPEAL — MISCONDUCT OF DISTRICT ATTORNEY — PREJUDICE.
Where wide publicity had been given to a homicide, and jurors, who admitted having read accounts thereof, were accepted to try accused, and it also appeared that during defendant's cross-examination he testified that his partner had been convicted of the killing, defendant was not prejudiced by an improper statement by the district attorney that accused's codefendant had been convicted of the same offense and had been sentenced to suffer the death penalty.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3126, 3127; Dec. Dig. § 1171.*]

9. WITNESSES (§ 277*)—CROSS-EXAMINATION—SCOPE.
Where accused becomes a witness in his own behalf, the cross-examination is not restricted to the precise questions put to him on his direct examination but covers the subject-matter involved in such questions.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 925, 979–983; Dec. Dig. § 277.*]

10. CRIMINAL LAW (§§ 419, 420*) — TRIAL — RECEPTION OF EVIDENCE — LIMITATION.
Where accused, in a prosecution for homicide, claimed that what he did was under coercion of his codefendant, the court properly refused to permit him to testify what his codefendant told him, and limited the inquiry to what defendant did under such coercion.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 973–983; Dec. Dig. §§ 419, 420.*]

In Error to the District Court of the United States for the District of Arizona; William W. Morrow, Judge.

William Stewart was convicted of murder, and he brings error. Affirmed.

The plaintiff in error, hereinafter designated the defendant, was jointly indicted with one John B. Goodwin for the crime of murder in the killing of one Fred Kibbe. The indictment was returned in May, 1911, by the grand jury for the Fifth judicial district of the then territory of Arizona, and charged the offense to have been committed on September 15, 1910, in that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

district, "within and upon the White Mountain Indian reservation," and alleged that the defendant was "a white person and not an Indian." A severance, being demanded by defendant, was granted, and, the territory having been admitted to the Union before the trial, the indictment was transferred from the territorial court to the court below, where a trial was had, resulting in a verdict of murder in the first degree, without qualification, and defendant was adjudged to suffer death. From the judgment and an order denying him a new trial, he prosecutes this writ of error.

While but three errors are specified in the formal assignment of errors found in the record, the defendant has in his brief specified several additional rulings of which he complains as involving prejudicial error, and in that regard it is stated that by reason of delay, over which defendant had no control, in the completion of the transcript of the evidence by the reporter, he was unable, at the time of suing out his writ of error, to present a more full and complete assignment than that found in the record; and he asks that the additional errors as assigned in his brief be reviewed by the court under the rule which authorizes the court to notice prejudicial error found in the record, although not formally assigned. As the record discloses some considerable delay in the completion of the transcript, without apparent responsibility by the defendant, the court is disposed, in view of the gravity of the case, to accord to it the consideration requested, and we proceed to a review of the various rulings complained of. While no question is made as to the sufficiency of the evidence to sustain the verdict, a brief statement of the salient facts will conduce to a readier appreciation of the pertinency and materiality of the errors urged.

The evidence of the government shows without controversy that one Fred Kibbe and one Alfred Hillpot were shot and killed about dusk on the evening of the 15th of September, 1910, at a remote wayside stopping place, commonly known as "Tuttle's Station," upon the White Mountain Indian reservation, in Gila county, Ariz. The defendant at the time of the homicide was, and had been for some months prior thereto, in charge of the station for the owner, and Goodwin, his codefendant in the indictment, whom he had previously served with in the army, had been staying with him at the house for several weeks. Kibbe and Hillpot, two young men from Globe, with whom they had no previous acquaintance, came to the station on September the 14th, the day before the homicide, on a hunting trip, having with them two riding horses and a hunting outfit. The defendant and his companion Goodwin were alone at the station and invited them to put up with them and make the place their headquarters for their hunt. This invitation was accepted. The next evening about 8 o'clock, while the four men were lounging in the main room of the building, Kibbe sitting by a table and Hillpot lying down in one corner, the two latter were, without warning or any previous altercation, shot to death by the defendant and his companion Goodwin, or by one of them. Kibbe was shot through the head with a revolver, and never spoke; Hillpot was shot three times with a rifle and, not being instantly killed, his skull was crushed by blows from the weapon, wielded as a club, and a deep wound inflicted in his throat with a knife, severing the aorta. The defendant and Goodwin immediately rifled the bodies of the slain men of money and other personal effects, took their arms and saddle horses, and within the hour fled from the place and disappeared. The crime being discovered the next morning, they were trailed by the officers and apprehended about a week later at a small railway station in a distant part of the territory, and, upon being searched, several articles of personal property belonging to the dead men were found in their possession, a watch and purse on Goodwin, and two purses and two revolvers on the defendant. No arms were found at the time on Goodwin. They were wearing the hats of the dead men. Their horses, saddles, and rifles had been abandoned.

When asked by the officers why they had killed the two men, defendant answered that they "had a fight over a dog; that they had to do it, and it was in self-defense." This statement was corroborated at the time by Goodwin. Substantially the same statement was made by the defendant after being taken to the county jail; but some little time later he repudiated this version of the killing and stated that the story was concocted by Goodwin,

who induced him to tell it; that the truth was that Goodwin alone had killed the men and coerced the defendant, through fear of bodily injury, to go with him when he fled. At the trial defendant adhered to this latter version, denying that he killed either of the two men or that he had anything to do with it further than to take a purse from the body of Hillpot after the killing, and that this was done under Goodwin's direction and induced by fear of bodily harm from the latter, who was armed. He testified that Goodwin, before the killing of Kibbe and Hillpot, had suggested the killing of several other people, including Mr. Tuttle, the proprietor of the station. He denied making some of the statements testified to by the officers, while admitting the truth of others, but said that Goodwin made up the story and induced him to tell it, and that "it was intended as a joke." He was the sole witness for the defense.

Benton Dick, of Phœnix, Ariz., for plaintiff in error.

J. E. Morrison, U. S. Atty., of Bisbee, Ariz., and J. C. Forest and O. T. Richey, both of Phœnix, Ariz., for the United States.

Before GILBERT and ROSS, Circuit Judges, and VAN FLEET, District Judge.

VAN FLEET, District Judge (after stating the facts as above). [1] 1. Considering the assignments in the order in which they are discussed in the brief, the first is that the court committed prejudicial error in its charge to the jury on the subject of the defendant's flight from the scene of the homicide. The extract from the charge which is complained of is this:

"The flight of the defendant with Goodwin from the place of the murder is also evidence of guilt and a fact for your consideration."

It is said that this is virtually an instruction that as a matter of law the defendant was guilty of the offense charged if he fled from the scene of the crime, and was a palpable invasion of the province of the jury to find the effect of that fact in the light of all the evidence. We are not inclined to regard this language, standing alone, as open to the interpretation thus put upon it, or that it would be so understood by the average mind, but we are quite certain that it cannot be so construed when read, as it must be, with its context. The entire feature of the charge bearing upon the question was this:

"The defense of Stewart is that he did not kill Kibbe, and did not participate in the commission of the crime by any act of his own, or by any agreement, plan, or understanding with Goodwin. The defendant admits that he participated in the robbery of the bodies of Hillpot and Kibbe. The statute provides that the killing of a human being committed in the perpetration of or attempt to perpetrate a robbery is murder. The fact of robbery is therefore a direct admission for your consideration. The flight of the defendant with Goodwin from the place of the murder is also evidence of guilt and a fact for your consideration. The only answer the defendant makes to these admitted facts is that he was compelled by Goodwin to do as he did. Is this answer sufficient in the light of all the events and surrounding circumstances? This is the question you are called upon to answer by your verdict."

It is quite apparent, we think, that by this language the court did no more in effect than tell the jury that defendant's flight, which he admitted, like the admission of robbery, was a fact tending to show guilt, which they could take into consideration in determining the ulti-

mate fact; and, while the language was perhaps not as discriminatingly chosen to convey the meaning as it might have been with more mature opportunity for deliberation, we are satisfied that under the circumstances presented to them by the evidence and the charge in its entirety the jury would necessarily so understand it. It is not materially different from the language of the charge construed in Allen v. United States, 164 U. S. 492, 498, 17 Sup. Ct. 154, 156, 41 L. Ed. 528, where the court, distinguishing it from that held erroneous in Hickory ·v. United States, 160 U. S. 408, 422, 16 Sup. Ct. 327, 40 L. Ed. 474, and in Alberty v. United States, 162 U. S. 499, 509, 16 Sup. Ct. 864, 40 L. Ed. 1051, say:

"But in neither of these cases was it intimated that the flight of the accused was not a circumstance proper to be laid before the jury as having a tendency to prove his guilt. Several authorities were quoted in the Hickory Case (160 U. S. 417, 16 Sup. Ct. 327, 40 L. Ed. 474) as tending to establish this proposition. Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt. Whart. on Homicide, § 710; People v. Pitcher, 15 Mich. 397. This was the substance of the above instruction, and, although not accurate in all its parts, we do not think it could have misled the jury."

In the case of Starr v. United States, 164 U. S. 627, 17 Sup. Ct. 223, 41 L. Ed. 577, relied on by. defendant, the jury were, in substantial effect, told that flight was in a sense a confession of guilt. This the court held was, within the principles of the Hickory and Alberty Cases, prejudicially erroneous. The present language is, we think, open to no such construction.

[2] 2. The second assignment is based upon ʻerror claimed to be involved in the admission in evidence against defendant's objection of a map of the territory disclosing upon its face the boundaries of the White Mountain Indian reservation, without independent proof first being made of its accuracy or authenticity.

In· the first place, we are inclined to the opinion, as seems to have been held by the trial judge, that the recitals upon the face of the map sufficiently evidenced its character as a public document; it appearing therefrom that it was issued from the General Land Office under the authority of the Secretary of the Interior. Holt v. United States, 218 U. S. 245, 252, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138; 3 Wigmore on Evidence, § 1684, p. 2157.

[3] But in the next place, if there was error in the ruling, it was ·entirely without prejudice to the defendant's case. Some five or six witnesses were called by the government, all of whom had resided in Arizona for many years and were familiar with the boundaries of the White Mountain Indian reservation and the location of the scene of the homicide, and all testified positively that the latter was within the boundaries of that reservation. One of these was the sheriff of Gila county, in which Tuttle's Station was situated, who had lived in the territory since 1881 and had been sheriff for eight terms, with frequent occasion in the discharge of his official duties to familiarize himself with that part of the reservation lying within his county; and another was Mr. Tuttle, the owner of Tuttle's Station, who testified that he had lived in the territory 36 years, that the station was on

the Indian reservation, and that when he built the house he was required to secure permission from the government authorities at Washington for the purpose.

[4] All this evidence was admissible for the purpose, was wholly uncontroverted, and quite sufficient, independently of the map, to establish the location of the premises involved in the inquiry. Holt v. United States, supra.

[5] 3. The third assignment relates back to the impanelment of the jury, and arises upon the construction of section 1033, R. S. (U. S. Comp. St. 1901, p. 722). That section provides that, when a defendant is indicted for a capital offense, a "copy of the indictment and list of jurors and witnesses shall be delivered to him at least two entire days before the trial." In due time a copy of the indictment, with a list of the witnesses and of the panel of jurors then in attendance upon the court, was furnished defendant, and the trial commenced without objection to their sufficiency. Before the jury was completed, however, the first panel was exhausted and a special venire was brought in. When the first name on this panel was called, defendant interposed an objection to his selection or that of any other juror upon the new panel, upon the ground that their names and residences had not been furnished him at least two days before the trial in accordance with the above provision. This objection was overruled, and the ruling is now assigned as error. We regard the objection as wholly without merit. In enacting the provision in question, Congress must be presumed to have had in mind the method provided by law for the impanelment of juries in criminal cases, and the very frequent necessity of calling in special venires after a trial has commenced. The statute is to receive a reasonable and practical construction in view of this requirement. The court can never know beforehand how much difficulty may be encountered in getting 12 fair and unbiased men, but, if defendant's construction of the statute is correct, then the court would be bound at its peril to have in attendance a panel sufficiently large to meet any possible contingency in that regard, for to conform to the statute literally, whenever a regular panel is exhausted, without securing a completed jury, the trial must end and be commenced de novo upon a new venire being secured, since the language of the statute is not that the names of the jurors shall be furnished two days before they are called but "at least two entire days before the trial." It is obvious that to so construe the statute would result in its being absurdly impracticable, and we are of opinion that the requirement is satisfied by furnishing a list of the regular panel of jurors in attendance at the opening of the trial. Its evident purpose is to put the defendant on an even plane with the government in preparing for his defense by giving him the names of the attending jurors and of the witnesses to be called against him. This purpose is accomplished when a list of the panel in attendance upon the court at the time is furnished him, since the government can have no advantage in knowledge of the personnel of a new venire called during the trial.

The same question was not involved in Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, relied on by defendant. There the government had failed to deliver to the defendants the list of witnesses as required, and it was held that the provision being for their benefit, to enable them to prepare for trial, was mandatory and, if not waived, must be complied with. The present case is more nearly like, if not strictly analogous to, Goldsby v. United States, 160 U. S. 70, 16 Sup. Ct. 216, 40 L. Ed. 343. There the government had furnished the defendant with a list of the witnesses to be called for "proving the indictment" (that is, to make out its primary case), but during the defendant's case evidence came out which could not be anticipated and which required rebuttal. The name of the witness called for such purpose was not on the list furnished, and the defendant objected on that ground to his being allowed to testify. This objection was overruled, and the Supreme Court, in sustaining the ruling, said with reference to the meaning of the statute:

"The words 'for proving the indictment,' and the connection in which they are used, clearly refer to the witnesses relied upon by the prosecution to establish the charge made by the indictment. They do not extend to such witnesses as may be rendered necessary for rebuttal purposes resulting from the testimony introduced by the accused in his defense. Indeed, that they do not apply to rebuttal is obvious from the very nature of things, for if they did, as was well said by the trial judge, it would be impossible to conduct any trial."

This reasoning applies aptly to the present case, since it would be equally "impossible to conduct any trial" under the construction of the statute contended for by defendant.

[6] 4. There was no error involved under the fourth assignment in permitting the witness Shafer to testify that from an intimate knowledge of Indian characteristics gained from many years official connection with Indian reservations, and his observation of the defendant in the light of such knowledge, the latter was, in his opinion, a white man and not an Indian. Such evidence may not be very strong or conclusive, but "it is good for what it is worth" (Reed v. State, 16 Ark. 499.; Locklayer v. Locklayer, 139 Ala. 354, 35 South. 1008); and where, as here, there was no countervailing evidence on the question, it was sufficient, if the jury believed it, to establish the fact.

[7] 5. The fifth assignment is based upon misconduct of the United States Attorney claimed to be prejudicial to the defendant's case. In closing his opening statement to the jury the Attorney said:

"Having shown these things, and the court having instructed you fully on the law, we will ask you to reach a verdict of guilty and to affix the death penalty on this young man, as has been done on his partner in crime."

Defendant's attorney immediately said, "We object to that last statement;" and the court promptly ordered it stricken out. Nothing further was said at the time by either counsel, and no instruction to the jury was asked with reference to the matter.

[8] While the statement of the United States Attorney was unquestionably unwarranted and highly improper, and one ordinarily well calculated, if permitted to go unnoticed, to work prejudice, the

general rule governing such breaches is that where, as here, prompt action is taken by the trial court to correct the wrong, a reversal will not be had except in instances where the breach is so flagrant that the court will necessarily presume prejudice to the defendant. Was the conduct of the United States Attorney of the latter character? We think a brief reference to the history of the trial will show that it was not. Early in the examination of talesmen in the impanelment of the jury it became apparent that the wanton and flagrant character of the homicide, with its sordid motive, had arrested very general attention throughout the territory wherever access was had to the newspapers, and that its circumstances were well known to many members of the panel; the prejudice flowing therefrom resulting in the exclusion of a considerable number, while others with equal knowledge of the facts, but not disqualified by a fixed opinion, were retained on the jury as finally sworn. This pervading knowledge of the crime itself being disclosed, it is hardly conceivable, although not directly elicited, that the fact, equally notorious, that Goodwin had previously been convicted of the offense and was then under sentence of death was not as well known to a number upon the jury; and we must recognize that human nature is so constituted that most naturally knowledge of such a fact in one or more of an aggregation as intimately associated as a trial jury is soon the knowledge of all.

Moreover, the fact that Goodwin had previously been convicted was brought out on the examination of the defendant himself. In his direct examination, with reference to when he first met Kibbe and Hillpot, the defendant was asked by his counsel:

"Q. And who was present at the time? A. Goodwin was present at the time. Q. That was John B. Goodwin? A. Yes, sir. Q. Is that the same Goodwin who was convicted for the killing of Alfred Hillpot? A. Yes, sir."

Under such circumstances, we do not think the court would be justified in holding that the fact disclosed by the District Attorney, presumptively already known to the jury, although involving a grave impropriety, was such as to necessarily work prejudicial harm to the defendant's cause.

[9] 6. The next four assignments are grouped in their presentation in the brief, and we may so consider them. They all relate to objections made to questions asked defendant on cross-examination on the ground, in some instances, that they were immaterial matters, and in others not gone into on the direct examination. After a careful review of the entire examination of the defendant, direct and cross, and having in mind the limitations on the right of the prosecution in that regard, we are unable to say that any one of the instances presented in the objections involved a transgression of the defendant's rights. The rule does not restrict the cross-examination of the defendant to the precise questions put to him in direct. It is the subject-matter involved which governs the limitation of the inquiry; and, while the cross-examination of the defendant was a searching one, it in no instance violated this limitation. His correspondence with Goodwin before the latter came to the station, his knowledge of his character and as to his being a deserter, the suggestions of Good-

win to defendant about the killing of other people, and particularly as to Mr. Tuttle, the employer of the defendant, and why the defendant did not warn the latter of his danger, each and all these matters were clearly involved in the statements made by the defendant on his direct examination as to his relations with Goodwin and the previous history of both of them. Nor were any of them immaterial to the inquiry, particularly as bearing strongly on the degree of credibility the jury should accord to the defendant. If it may be truthfully said that the cross-examination was in some respects unrelenting and pitiless, it must be answered that it was invited by the very remarkable character of the defendant's evidence and the necessity of the prosecution to rely largely upon the cross-examination to show its untruth. We find no error in it.

[10] 7. The tenth and last assignment arises on a ruling made during defendant's direct examination. He was being interrogated about the property of the dead men taken with them in their flight, and was asked by his counsel how he came to see the guns and ammunition. He answered, "Well, Goodwin told me I might need it." This answer was stricken out on motion of the United States Attorney as improper. His counsel then offered to prove that the defendant took the guns and all the other articles of the dead men under coercion from Goodwin. The court ruled that he might show that what he did was under coercion, but not to relate conversations between himself and Goodwin. We think this was a proper limitation of the inquiry, and under it the defendant was given all the latitude that was proper. The record shows that he was permitted in various ways and on different occasions during his examination to lay before the jury his theory of his defense that all he did in the transaction was at the coercive instance of Goodwin.

The examination of the somewhat voluminous record has been beset by much difficulty and labor on the part of the court in an endeavor to locate the matter involved in the various exceptions, owing to the fact that the briefs have no proper reference to the pages of the record where the exceptions are to be found; the brief of the government being silent in that regard, and that of the defendant referring to the pages of the reporter's transcript instead of the record as filed here. This latter omission, we assume, arises from the delay in completing the record, and we overlook it. We believe, however, that we have covered all the matters embraced in the case of which defendant has complained or could justly complain, and as a result we are unable to discover anything of a nature to justify us in disturbing the judgment of the court below or its order denying a new trial.

The judgment and order must therefore be affirmed; and it is so ordered.